Good morning, Your Honors. Michael Belter on behalf of Appellant along with my co-counsel Jay Ritt. Your Honors, I'm going to divide the argument into two sections. I'll take the first 15 minutes and then Mr. Ritt will take the next 10 and we'll save 5 minutes for rebuttal. Your Honors, this matter, Mr. Ayala went to trial in 1988 and he was sentenced and then he was found guilty and then sentenced to death. He's currently on death row in San Quentin. Our position, what we've presented to the District Court is that there were serious constitutional defects that permeated throughout his trial. I'm going to focus initially on what we consider to be an extremely egregious violation of Brady v. Maryland as it pertains to one of the three most significant witnesses in the case and that's Juan Mesa. In this case, there was little or no physical forensic evidence that linked Mr. Ayala to the triple homicide. There were, in fact, three witnesses. Mr. Castillo, who was the surviving witness whose initial description of the assailants, which were corroborated by other independent witnesses, did not point towards Mr. Ayala. Eventually, Mr. Castillo identifies Mr. Ayala. Second most significant witness and the one I'll address this morning is Mr. Juan Mesa. Mr. Juan Mesa had been an informant for the detective Carlos Chacon for at least 10 years prior to this killing. Where in the record does it say that? He knew him, of course, for many years. The record is replete with those indications. And Chacon had a file on him for 10 years. Where does it say he was an informant? In fact, Chacon was asked repeatedly whether he was an informant, denied every time that he was an informant. It said that had special status in police lingo. Detective Chacon, his testimony before the evidentiary hearing is that he had started to keep a file on Juan Mesa starting in 1975. Detective Chacon was a gang intelligence officer. That's making him an informant. An informant is one who is deliberately cooperating with police knowing that they're going to be passing information on. That was not the relationship that Chacon said that he had with Mesa. It's not the relationship that Mesa said he had with Chacon. So where's this coming from? This is coming from both Mesa and Chacon testified at the evidentiary hearing that Mesa often met with Chacon. Sure. That doesn't make him an informant, though. But, I mean, it may make him a witness and it may make him very, very useful to the police. But that gives him a very different status if he's actually an informant. So I'm wondering what your basis is for saying he's an informant. Our basis is simply that Chacon and Mesa confirmed that they had a relationship that went back to 75, and that Chacon oftentimes visited Mr. Mesa either at the penitentiary, the California Department of Corrections, or in the San Diego County Jail, oftentimes uninvited. That Mr. Mesa — This is the duck argument? I'm sorry, Your Honor? This is the duck argument? It walks like a duck, talks like a duck? Is that your — that is functionally — I think functionally correct, Your Honor, in that Mr. Mesa had a relationship with Detective Chacon. They oftentimes met. Mr. Mesa was a member of the Mexican Mafia. So, yes, if it walks like a duck and quacks like a duck, we're going — our position is that it's a duck. The defense team knew that Mesa had known Chacon for many years, and the defense team knew that they had visited and about this file that you're talking about. Yes. So what — what did they not know? Is this a Brady claim? It is a Brady claim, Your Honor. Okay. So what was — what was not disclosed, counsel? What was not disclosed is the following. The first is that Chacon kept a file, a police department file, on Mesa for over 10 years or approximately 10 years, and this was prior to the 43rd Street killing. Mesa's — what was never disclosed and what we feel should have been disclosed is what the basis of those conversations or contacts were about. Clearly Mr. Mesa was a member of the Mexican Mafia. That was why Mr. — Detective Chacon would seek him out, use him as a source — Is it your — forgive me for interrupting. Is it your contention that there was a failure to disclose his membership in the gang? No. They knew that? They knew that. All right. So forgive me, but what is it they didn't disclose? If you could be specific, that would help me. Sure. During the course of the evidentiary hearing, Mr. Mesa testified that he in fact received use and derivative — use and derivative immunity as a result of debriefing with the Department of Corrections Special Services Unit. Okay. So now you're talking about Claim 76? 76. But Claim 76 also, we feel, dovetails into Claim 8 and also Claim 6. Yes. Yes. All right. And so this — So if we're going to talk about 76, then, again, your time is ticking, so maybe you can stop me. But my understanding from the briefing is that that claim is a — is a — well, first of all, the immunity agreement that he did receive was admitted as an exhibit at trial? It was, Your Honor. He made statements at the 2010 hearing, Mesa — Yes. — which, if we can consider, went to the effect that — that he may have received more, that is, being excused from earlier assaults or perhaps even a murder that was committed in prison. The trial court judge didn't buy it, right? He thought that — You're talking about the district court judge. Forgive me. Yes. The district court judge thought that Mr. Mesa was at best confused about that, that he was wrong about what — it was 22 years later, right? Right. Your Honor, I was — And I didn't see anywhere in the record — I don't know if you could help me. I didn't see anywhere in the — any place in the record where there was any indication other than that testimony from Mr. Mesa that he did get any additional breaks as a result of his testimony. The fact that Mr. Mesa, testifying 22 years later, that he had — was debriefed by a special service agent for the Department of Corrections where he was also dropping out from the Mexican Mafia, and he admitted that he had committed prison assaults and even a murder. Well — Right? But — He didn't admit that he committed a murder that I could see. Right. There was — there was allegation that he had, but it was many years earlier, and he had indicated — Mesa indicated in the 2010 testimony that the State had stopped pursuing that, had decided not to pursue it. But, Your Honor, there's no statute of limitations on murder, and quite frankly, Detective Chacon in his testimony before the district court also testified that he believed that Chacon — that Mesa had committed a murder in prison and that he had — he was relying on sources that he had within the Mexican Mafia and within prison. And so, Your Honor, the fact that Mr. Mesa is given immunity and he's testifying on behalf of the government, but he has an immunity for those type of offenses, certainly that should have been disclosed to the defense, but they would have used that to impeach or — What's your strongest shot at — what's the best evidence that he was given immunity for those earlier offenses, counsel? Mr. Mesa's admission and Mr. — and Detective Chacon's statement that he believed that Mr. Mesa was a member of the Mexican Mafia and he killed in order to get into the Mexican Mafia, and that's the only way you get into the Mexican Mafia. What do we do with the district court's finding after the evidentiary hearing that Mr. Mesa was confused and was — Well, our — with all due respect, we feel the district court just got it wrong, quite frankly. And certainly, if an individual has been given — is given protection and is given a blanket immunity for these type of offenses, that certainly would have been something that would have been relevant and material to testing his credibility before the jury. Thank you. And, Your Honor, one last point as far as Mr. Mesa. It's also our position that Mr. Mesa testified that he was hoping to get released but, in effect, he — that had long been set in stone and the government had made efforts more than a year before to — under Penal Code Section 1170D to file a diagnostic report with the CDC, which was the first step to ensure that he would be released. Mr. Belter, so oftentimes when we get Brady claims, we — the defense is fortunate enough to come up with a particular document that the government has withheld. It's been found in government files. It's been released to the press. Something has occurred. Do you have anything like that? What you're — what you're arguing is that there was a sidebar agreement that was outside of the plea agreement that Mesa had with the police here and that his informal testimony 22 years later suggests that he got more than was actually disclosed in the agreement. But you don't have any — you don't have any document — you don't have any documentation for any of that. You don't — you don't have — you don't have a piece of paper or something else that the government — was in the government's files that you know of and that should have been turned over to the — to the defense. With the exception of the diagnostic, the 1170D application, which was filed a year before Mr. Mesa ever hit the stand, right, I would have to answer specifically no. Is the effect of that, the 1170, that the prosecution was then in a position to ask that he be resentenced? Yes. And that happened? It did. Did it happen after his testimony? Mr. Mesa was released within two weeks of his testimony. Different question, counsel. Yes. When did they ask the superior court to release him? After the testimony? Right after his testimony. So when you said it was a done deal — It was a done deal. Yes, Your Honor. It was a done deal, perhaps, that they were going to ask. Your Honor, in all due respect, it was a done deal, period. Okay. So I'm listening. Go ahead and — No, Mr. — it's our position that Mr. Mesa was guaranteed that he would be released upon his testimony. And what is your strongest evidence of that? The fact that he was released right after he testified. The fact that the government, a year before he testified, had already started the wheels in motion to have him released. Recall that when Mr. Mesa became a witness in this case, certainly at the — and it's our position that at the behest of encouragement of Detective Chacon, that was two years after the offense. Yes. And at that time — I'm certainly not going to suggest that the trial was imminent, but by 1987, the trial, that would have been two and a half years by the time Mr. Mesa was now being contacted by Detective Chacon, and then eventually made a deal with the District Attorney's Office. The point being that the trial was certainly — could be considered certainly imminent at that point. He was to be released upon his testimony. The fact of the matter is that he didn't testify again. The trial started in April of 1988, and he testified in October of 1988. You know, at this point, Your Honors, unless you have other questions, I'm going to defer to Mr. Ritt. Mr. Ritt is going to address the many claims that we've made as to ineffective assistance of counsel. Thank you. Mr. Ritt. Good morning, Your Honors. May it please the Court, Jay Ritt for Appellant Ronnie Ayala. I'd like to shift gears to one of the other, but certainly not the only other, significant issue that brings us here today, and that is our evidence that trial counsel for Mr. Ayala fell below the standard of care in essentially failing to present the significant, available, and critically important impeachment evidence of the most important witnesses that the prosecution brought forward during the trial. Specifically, impeachment witnesses available to testify that Juan Mesa had indeed admitted that he was concocting his testimony in connection with Detective Chacon. Two of those witnesses testified at the evidentiary hearing in front of the district court, and their testimony was consistent with what they had said 20-plus years prior. I think under this Court's opinion, in Lord v. Wood, that's a particularly apt case in providing direction for Your Honors in evaluating these claims. As in Lord v. Wood, the district court ultimately concluded, as we know, that it found that there were potential inconsistencies. These were presented to the state court, right? Excuse me, Your Honor? These claims were presented to the state court. The claims were presented to the state court in the exhaustion petition. The claim specifically as to Mr. Cevaccio was presented to the California Supreme Court in the direct appeal, as well as in the pre-exhaustion state court petition. It's a pretty steep standard for us to reverse once the state court addresses an IAC claim and rejects it. Ordinarily, that's true, Your Honor. But in this case... Double deference and all that? Double deference, but not in this case, for the following reasons. Your Honors are not obligated to provide double deference to a decision by the California Supreme Court that is unreasonable under 2254D. And for two reasons we know it's unreasonable. The first reason is that in granting the evidentiary hearing, the district court determined that the decision by the California Supreme Court in particular with respect to Mr. Cevaccio was unreasonable because... This was before Pinholster, right? It's before Pinholster, yes, but it's addressing... Pinholster changed a lot. It didn't change... It's not clear that district court would have granted an evidentiary hearing before... I think the Court would have for the following reasons, Your Honor. The Court pointed properly to the fact that in the direct appeal, the California Supreme Court misstated the record with respect to the IAC claim. In particular, the California Supreme Court rejected the IAC claim by making a factual misstatement that the reason why trial counsel did not call Richard Cevaccio was because of his membership in the MA. That was an inaccurate description of the record. And Judge Moskowitz, the district court properly noted that. Even after Pinholster, that same analysis holds true. In Brumf... The second reason is... And we know that from some of this Court's decisions, Nunez and Hurls v. Ryan. This Court has indicated that while double deference ought to apply to a reasoned decision, then we're going to presume even on a summary denial that the California Supreme Court had a reasoned decision. Where that summary denial is unreasonable, or looking beyond that summary denial, if the decision of the California Supreme Court in addressing the record was unreasonable, you are not obligated and shouldn't provide that kind of double deference, and you should look at the evidence yourselves. I think in one of the other compelling arguments about why double deference ought not be provided here is that the California Supreme Court has held in People v. Duval that if a prima facie case of IAC is presented to the Court, they will not issue a summary denial. Okay. So... So... So at the very... All of your comments so far seem to be going to Savocio. I mean... Starting with your comment that these were both exhausted. Raul Garcia was never presented in the exhaustion petition, right? His name was not specified. And as the district court noted, that did not preclude the California Supreme Court from evaluating that claim. Well, since you're talking about Duval, how would they do that? Why isn't that a cursory presentation that is not adequately presented to the California Supreme, as to Mr. Garcia? Mr. Garcia... How were they going to evaluate it if he wasn't even named, counsel? His name wasn't mentioned, Your Honor. But the petition that was presented to the California Supreme Court said that Savocio and others would have testified that Juan Mesa had admitted to them that he was concocting this story. Now, may I finish? Sure. Under Duval and Romero, we aren't obligated and we're not necessarily able to come forward and prove those allegations or even present declarations in support of those allegations. The California Supreme Court is obligated to accept those allegations as true for the it's going to issue in order to show cause or issue funds for investigation or set an evidentiary hearing, and they didn't. They issued a summary denial. It's part of the reason why the district court allowed us to present Raul Garcia as a witness in support of our IAC claim as well. The district court held that not specifying Garcia's name, but indicating to the California known to the defense counsel, could have been presented as impeachment witnesses, put the California Supreme Court sufficiently on notice and created a prima facie case. The district court held there was a prima facie case of IAC, including Raul Garcia, sufficient to warn an evidentiary hearing. If there's a prima facie case, as I think we all agree, given what was presented to the California Supreme Court and the California Supreme Court determines not to go forward at all, no, just a summary denial, which is what they did, they simply aren't entitled to double deference at that point. At that point, the district court is entitled to take evidence as it did, and you are entitled to look at that evidence. To hold otherwise would essentially render this court to be a rubber stamp. Let's suppose you jump all of those hurdles. What have you got with respect to Savaccio? What demonstrates the ineffective assistance of counsel? Well, a number of things. Mr. Savaccio, Mr. Raul Garcia, as well as other witnesses, including the recently discovered Stanley Chalbert, all testified then and now. Well, Mr. Chalbert not then. He's not, he wasn't available then. Testified that independently of themselves, Juan Mesa had admitted to them that he was making up his story about having purported to plan this attack with the Ayala's in order to curry favors with Detective Chacon. And Savaccio testified to that in a 402 hearing. He testified to that consistently at the evidentiary hearing. He didn't back down from that. This is 20 plus years later. He came out from Arizona. He had no reason to lie. Raul Garcia had been. Well, I'll accept all of that. Right. What demonstrates that counsel was ineffective in not calling him? Well, we had the testimony of two experts, Steve Harmon in declaration form and Mark Overland, whom the district court appointed about halfway into the evidentiary hearing. Initially, the district court did not want to appoint a Strickland expert, but as the testimony was elicited, he determined that. I'm still, I'm getting lots of talk around it, but I can't get you to tell me what makes this ineffective. Why, why is, why was the defense's strategy wrong here? Because there was. Counsel, counsel knew that, that Savaccio was, was, could be impeached. And it was also apparent that the district court was going to allow him to be impeached on, by admitting the gang evidence. And this is just going to, this is just going to throw off all the strategy that the defense took. Now, the defense's strategy in the end may not have been the strategy that you would have chosen. That doesn't make it ineffective. It's a tactic that the Strickland expert, the only Strickland expert to testify, concluded fell below the standard of care, was not reasonable for the precise reason that at the end of this trial, the critical witnesses, Mesa, Castillo, were never impeached at all in a way that could have successfully demonstrated that they were lying, making up the story, had reasons to lie. And that allowed, that allowed the prosecutor to argue in closing, as he did, that essentially no defense had been presented. Without impeaching those witnesses who were demonstrable liars to begin with. But Ms. Simmel did impeach them. The question is whether she should have impeached them further with this other evidence. She impeached them as to other inconsistencies. As to Mesa, they certainly knew he had an incentive to lie, right? They certainly knew that he was a jailhouse snitch, if you will. Absolutely, Your Honor. That was all pointed out. The question is whether she should have done this other thing, which would run contrary to her trial strategy. And there was a cost to introducing any mention of gang evidence. And that was the tradeoff decision she had to make, right? Why isn't that tactical? Because the cost that she was afraid of was an unreasonable fear, as Mr. Overland concluded. And the gain was that the witnesses to be presented were not cumulative of testimony that had already been presented. There was no testimony from anyone that Juan Mesa had admitted to making up this story. After? There was no, I'm sorry, and there was no testimony from anyone that Pete Castillo had tried to solicit two different people to kill one of the victims. One of the arguments that the prosecutor made about why Castillo should be believed in shifting his identification from the Mexican nationals who he initially identified to four different people to the Ayala's was that he was afraid of the Ayala's and that he had no other reason, no other reason to make up the story. Counsel, the witnesses you're speaking of weren't all called in the other trials, were they? In Hector's trial or in Mr. Moreno's trial? I don't believe that they were, Your Honor. Same tactical decision was apparently made. It's not that these people were unknown, right? There was a cost calling them. Well, the, I can't speak to what happened in the other trials, nor can I speak to what trial counsel's decisions were in those trials, but the cost. It was part of the Federal District Court's order, right? He made that, am I correct that he made that observation that these witnesses weren't called in the other trials either? He made that observation. But the cost, Your Honor, that you're talking about, the potential cost, there was no demonstration of what that cost would have been. Part of the reason that the district court gave an evidentiary hearing to begin with was the district court's conclusion that these impeachment witnesses could have been very, very critical and important to impeaching the two most important witnesses in the case. He gave that evidentiary hearing and essentially said in his order to the State, you will have an opportunity to demonstrate the cost of putting on these witnesses. What was that cost? There was no, there was nothing put on by the State that had, as Justice Breyer testified, had. Counsel, if you could let us ask our questions, that would be helpful. I'm sorry. If Cervacho had been called, then the State would have had the right to have impeached him on the basis of his gang membership, isn't that correct? He did not have any gang membership, Your Honor. So, presumably, they could have, but they couldn't, here's what they couldn't have done under Cardenas and Munoz, which is what Mr. Overland said was critical. They couldn't have simply said, which would have been untrue anyway, because he was not a member of the M.A. If you're a member of the M.A., we get to bring that out and we get to demonstrate that Mr. Ayala is a member of the M.A. That's part of why the fear, the concern that caused the trial counsel not to call those witnesses was unreasonable, fell below the standard of care. Counsel? Yes. After Rafa recanted, it seems to me that you have a much stronger argument. Could you focus on that? Thank you, Your Honor. Thank you. And I just want to take a couple seconds so I have some rebuttal time. But once Rafa recanted, as Your Honor points out, all of that concern, which we contend was unreasonable, that trial counsel had about gang taint, was gone because it was in. Okay. Okay. Okay. Okay. Hold it, please, if I could. The California Supreme Court didn't think so. They thought that she had — Ms. Semmel had preserved her trial strategy. They thought that the jury still hadn't heard the word gang or Mexican mafia and that that was still on course. And I've looked in the record to try to figure out, you know, at the time of the trial, not at the 2010 hearing, but at the time of the trial, whether the defense strategy ever — defense team ever articulated that they thought that they're — that that was not true, that the cat was out of the bag. And I can't find it. Is it in there? Is it in there that the defense team said at that point the cat was out of the bag and we should have rethought it? Right. Yes, it is. Where is it, please? Your Honor, I may have to find that site for you and provide it to you after this hearing. But trial counsel did express that once that happened, she was — felt like her entire strategy had been blown up. Well, she said she would have tried the case differently. It was a different case, and she wished she had run a different — or she would have run a different strategy had she known that that was going to happen. Let me ask you this, though. Even if she had said, oh, my goodness, you know, now there's this very strong reference or inference, I think that Rafa said that he and Mr. Ayala were both members of — in front of the jury — members of the southern group. Is that right? No. I think what Rafa said was he was afraid that Mr. Ayala would hurt him if he provided the testimony and that he had concerns about both the southern group and the northern group. OK. So that's what happened in front of the jury? In front of the jury. OK. At that point, were her choices to tell the jury what? There's this — there's this thing I haven't told you for the last — you know, up until now, your briefing doesn't discuss that, but she was in a very tough spot, right, if she was going to reveal that this had been something that had been kept from the jury? Well, she was in — I don't think she — I think at that point, her call to not present any of this impeachment testimony was rendered completely superfluous. And she should have not admitted to the jury that she had withheld evidence from them but said, all right, Gang is now part of this case. There's no reason for me not to put these critical impeachment witnesses on. I'm going to do it. But she didn't. All of them or just Sabaccio? I think she could have put all of them. Sabaccio and Garcia were available. Johnny Mendez was available to impeach Castillo. And also available was Luis Bubu Garcia to impeach Pete Castillo. All of these witnesses were available throughout the trial. Once Gang was out of the bag, there was zero reason not to do it. And Mark Overland testified to that as well during the evidentiary hearing when he concluded that she fell below the standard of care. I'd also like to point out that when the California Supreme Court evaluated this claim, it did not have any Strickland testimony from Mr. Overland. Thank you, Your Honors. I'd like to reserve the rest for rebuttal. We have a mistake. Good morning, Your Honors. Mike Murphy, Deputy Attorney General, on behalf of a respondent and appellee. Pinholster instructed that evidence received in federal court has no bearing on the 2254 issue. Therefore, with the exception of a small portion of Mr. Sabaccio's issue, all of the evidence that was received in federal court, which has been the cornerstone of counsel's argument here, is not relevant to the issue of whether or not the district court properly found it was not an unreasonable determination by the state court. In that regard, as pointed out before, the issues that have been discussed here in particular, again with the exception of Mr. Sabaccio, the state court was presented with close to nothing. They didn't identify in state court the witnesses they have produced in federal court, and they didn't present any documentation or statements from counsel that would have explained decisions that they made, right or wrong. So the California Supreme Court was left with, really, a skeletal allegation that wasn't supported with available documentation, and that wasn't, even if accepted as true, going to establish the elements of IAC to prove deficient performance or prejudice or a Brady claim. Again, because even if you accept the allegations as true, you have to judge those in light of the entire trial record, and there wasn't a basis to conclude that they could establish violations of those constitutional rights or prejudice. What about the other allegations, particularly the allegations that there was a police or, say, detective, Chacon is the person I'm referring to, who had coerced witnesses, who was very certainly proximally located at very critical junctures, including just before Rafa recanted. What about that? Are we talking about in the state court in particular or just the overall evidence here? I'm saying that this allegation was included in the exhaustion petition, was it not? Yes, it was. Yes. Okay. So why is it reasonable to go forward without – why was the fact-finding process reasonable in the state court to not have a hearing on that issue? Right. Well, there was a lack of particularity in the factual allegations as to how that happened. There was also – you could – there wasn't a basis to establish that any of his conduct would result in prejudice, that any of the conduct was known, you know, to the prosecutors in this case to the extent that they suppressed evidence. Well, the allegation, counsel, here's what I'm trying to get at, but I don't think I asked my question very clearly. But I think the allegation in the – by the time they got to the exhaustion petition was that Detective Chacon had visited this witness – I'm speaking of Mendoza-Lopez, Rafa – shortly after he testified that he had coerced, you know, threatened him that there was going to be a – that he would let it be known that that Rafa had testified. So – and, of course, he was a prisoner at the time, so this was a life-threatening threat, it seems to me, that his wife had been threatened that her children would be taken away or she would be prosecuted for bringing drugs into prison. I think that's – I'm summarizing, of course, but I think that was the allegation and yet no hearing on that claim. Right. And those allegations were made by an investigator based on hearsay. Hart. Correct. Investigator Hart. Right. I think his declaration says on information and belief a lot. And so, on the other hand, it's a case involving gangs. Maybe there was concern about retribution or an unwillingness to put all of the information in the declaration. Where do we draw the line there? Well, I mean, the line has to be drawn with the rule that the California Supreme Court has, that you have to present sufficient particularity in your assertions and you have to present available documentary evidence that would essentially demonstrate to the court that we can prove these allegations. Okay? So if you grant us a hearing or if you order an OSC, we have something to back up these allegations. That was lacking in this case. And that standard is consistent with the Federal Court standard.  And especially in light of the record, you're allowed to reject those if it just doesn't meet that bar. So they had the Hart declaration. I think that's the only thing that supported the exhaustion petition. Is that right? I believe that's correct, too. And is the thing that makes it insufficient that he said, this is pretty specific allegations, but that he based it on information and belief? Is that the deficiency? Well, I think that's part of it. California requires that if a declaration is presented, you basically need to present evidence in the form of someone who can testify to that in court. So here we have hearsay. California also requires that you provide, because I don't think it's just that to answer your question directly, but it was also here a lack of other evidence that you would think would be available, such as declarations from the witnesses themselves who could purportedly back up this assertion based on information and belief. And you have, you know, with respect to the IEC claims, you don't have a declaration from counsel or a declaration from anyone explaining why there's not a declaration from counsel who could address what they knew about this and the reasons they had for proceeding as they did. So you essentially have, I mean, if you really, what you have is, you know, years after the fact, a defense team could present a declaration from their investigator, and if you look at that Hart declaration, it essentially is a lot of just his opinion and conclusions based on circumstances. I mean, if that's enough to invoke, you know, the process of the courts, that's an extremely low standard. And California rejecting that in this case certainly did not act unreasonably. So first counsel addressed the Brady claim with Mr. Mesa. The district court, well, first of all, I should state that that, again, was a claim that was denied by the California Supreme Court, and so all the evidence that was offered in federal court really doesn't bear on that issue. But even if we consider it, the district court made findings that there was no evidence to support that there was any misconduct or any threats or inappropriate behavior by Dr. or Mr. Chacon, Detective Chacon, and that there was no basis to conclude that there was suppression by the government of any material exculpatory evidence. Claim 76, which adds the aspect of the immunity agreement, first, that wasn't a certified issue. It's also, it was agreed below, wasn't exhausted. So relief can't be granted for both of those reasons, but it can be denied. And, of course, the district court found that there was no basis, again, to conclude there was government wrongdoing with respect to that, to the extent Mr. Mesa, 22 years later, believed a certain thing about it, really doesn't bear on the issue of whether or not the government committed misconduct in that case. They've asked us to send that back because it's completely unexhausted. It was a function of the 2010 hearing. The State court's never seen it. What's your response to that? I'm sorry. Your initial question in the beginning, I didn't hear. Well, they've made a couple of different requests, a couple of different ways in their briefing that that should be remanded, that there should be a hearing on that issue in the State court. So the State has an opportunity to rule on it. Well, my position is that it should be denied outright or affirmed that it was denied if this court disagrees with that, then yes, it's an unexhaustive. I'm sorry. I didn't hear your answer. I'm sorry. My first point on that would be that it should be denied or affirmed that the district court denied. That's your bottom line. I got that. Okay. That much I understood. I'll move on from there. You sort of turned away from the mic when you started explaining why it should be denied. So I just missed the words. I'm sorry, Your Honor. I think I simply moved into the point that if this court were to disagree with the district court's ruling on that, then I do believe that because it's unexhaustive. Is there anything that prevents them from going to the State courts now? No. I mean, even as we speak. No. They could have done it last week or the week before. That's correct. They could do it today. That's correct. And what effect would that have? On what? I mean, if they get relief there. If they get relief there? I mean, if they get relief there, they get relief there. If they go to district court, we do not. I mean, let's assume some of the normal course of events. We are working on disposition and we don't remand. What would be the effect of ongoing State proceedings? Well, I mean, there's so many potential things that could happen, of course. If it gets denied there. If they get denied there, then they would have an opportunity to come back here and attempt to. They would have to, what I'm getting at is they would have to raise it by a successive petition. Yes, Your Honor. It could not be folded into this one. I agree with that. Yes. I'm sorry if I didn't understand. Yes. That they would have some hurdles to meet. Yes. Yes. Um, is it clear that the California courts would hear it if they went back to it? That they would hear it on the merits? I don't think that's necessarily clear. There are standards for presenting new evidence, newly discovered evidence that would allow them if it meets certain criteria. But of course, just like federal courts, there's bars to successive petitions. But I can't predict that. There is an opportunity for sure. Your Honors, I think I've covered the points I'd like to make, unless there's any questions, I'm prepared to submit. Thank you. Thank you. Um, we'll make it three minutes.      Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Just a couple points in response to the State's argument. I think the State overstates what the requirements are in the California Supreme Court. The exhaustion petition that was submitted was supported by the Eric Hart Declaration, as well as the Declaration of Steve Harmon. And under prevailing Ninth Circuit law and California law, People v. Romero, People v. Duvall, the Nunez case, Taylor v. Maddox. The standard is whether we're going to be giving the California Supreme Court double deference or not. And as long as the allegations support a prima facie case, the California Supreme Court should issue an OSC order, further briefing, set, give funds for discovery. And none of that happened. And if that doesn't happen, and it's fine. California Supreme Court doesn't have to do that. But they're not then entitled to the double deference that this court, that the State wants this court to apply. When a prima facie case, based on allegations alone, and the specific allegations in this case, created a prima facie case, which the District Court filed. So with all due respect, I think under the prevailing Ninth Circuit law, as well as Romero and Duvall, which is very clear, about when the California Supreme Court will issue an OSC and ask for more briefing, and most importantly, provide funding for investigation and discovery. When we go to the California Supreme Court with an exhaustion petition, we don't have funding to do any discovery. And I'm not aware of any case that provides that it's a requirement to submit a declaration of trial counsel whom we don't have subpoena power over, we don't control, in order to have a non-skeletal petition that's going to be sufficient to defeat double deference. I'm not aware of any case that provides that. As to the issue of what to do with some of the new evidence, if this Court does conclude that the District Court and this Court are not entitled under Penholster or Richter to evaluate the evidence that was developed in the evidentiary hearing, I do think it's appropriate under the Quezada case that we cited for this Court to issue an order back to the District Court asking them to remand under Rhines back to the California Supreme Court to give us that opportunity, and we will take that opportunity. Is that, is the idea under, sort of, Gonzalez v. Wong that something happened to the evidence, there's some new evidence that has transformed this into a new claim? Is that your theory? Essentially, yes, Your Honor. That basically there's new evidence that makes the claim much stronger, because what we don't want to have happen is we don't want to simply go back to the California Supreme Court without that order and have them kick us out as a successor petition when, in fact, we've met the two standards under Rhines. The evidence makes much stronger the claims that were previously presented, and we exercised due diligence in developing that evidence and we didn't intentionally withhold it from the California Supreme Court. And I believe we can meet both of those standards if that's what the Court remands back to the District Court to do. There would have to be briefing on that, but I think we could do that, and that would be our fallback argument. I'd like to ask just a few questions. I think you're actually out of time, but I'd like to ask a few questions about procedural default. California thought, Supreme Court thought that many of these claims were untimely. My understanding from the record is that in the District Court, you all, the defense team briefed, basically, the Walker issue, but also requested permission if the Court ruled against them on the adequacy of California's timeliness rule, sort of had placeholders in there about cause and prejudice, but didn't brief cause and prejudice. That's right. When after Walker, again, just correct me if I'm wrong, absolutely. This is an invitation to correct me if I'm wrong. I want to make sure I've got this right. After Walker came out, the Federal District Court judge decided not to take you up on the offer to brief cause and prejudice. Instead, under Franklin, went straight to the merits. Is that right? That's exactly right, Your Honor. Okay. In the blue brief to us, I don't see any mention of cause and prejudice or timeliness at all, but please point it out to me if I've missed it. You haven't missed it, Your Honor. Okay. The opposing counsel has a couple footnotes indicating where, issue by issue, where there are some rulings about timeliness, and then in the gray brief, there's not a response on cause and prejudice. I don't think. We did not brief those issues, Your Honor. I think that we briefed them at the District Court level, and our arguments were that— Sorry. Did you brief—you briefed cause and prejudice at the District Court? Not the cause and prejudice, but the argument about the procedural defaults and the inconsistencies in how they were applied by the California Supreme Court, which would render them— Not, you know, would keep them from barring our claims because of the inconsistencies. And there was extensive briefing on that. We didn't brief it here. But now you've lost that, right, because of Walker? Now you've lost that argument? And I think that the District Court then, in his order post-evidentiary hearing, realized that he could send this back and ask you to go back and brief cause and prejudice, but chose not to. Is that right? That's right. So we don't have that briefing? We don't. If we go back to the California Supreme Court on our rinds, I imagine those issues will be briefed. Well, but I'm talking about not going back. I'm just talking about in the Federal Court action, we don't have cause and prejudice briefing here, right? If this Court is going to focus on that issue as dispositive, we would request an opportunity to provide additional briefing on that. When the State invoked it in the red brief. We had very limited space. We had 26 certificates of appealability. We were instructed to reduce our brief even more from what we had done. We tried to brief what we thought was critical and necessary. But you didn't acknowledge it, right? Excuse me, Your Honor? You didn't drop a footnote to say, gee, if the Court has questions about that, we'd like an opportunity to brief it. We didn't, Your Honor. Okay. Thank you. Thank you.
judges: Kozinski, Bybee, Christen